## WINGATE et al. v. RENDER.

No. 5888.    Opinion Filed February 29, 1916.

Rehearing Denied October 31, 1916.

(160 Pac. 614.)

1.    **APPEAL AND ERROR—Review—Harmless Error—Statutory Provisions.** The Supreme Court, in every stage of action, is required by statute (sections 4791 and 6005, Rev. Laws 1910) to disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party.

2.    **CONTRACTS—Fraud—Effect.** Contracts induced by fraud are not void, but voidable. The defrauded party may elect, with knowledge of the facts concerning the fraud, to treat the contract as valid, and if he does so, he cannot thereafter change his position and insist that it is invalid.

3.    **FRAUD—Actions—Evidence.** A wide latitude is allowed in cases of fraud, and circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.

4.    **FRAUD—Elements in General.** To constitute actionable fraud, it must be made to appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; (6) that he thereby suffered injury; and (7) all these facts must be proven with a reasonable degree of certainty, and all of them must be found to exist; the absence of any of them would be fatal to a recovery.

5.    **BILLS AND NOTES—Actions—Questions for Jury.** Evidence examined, and **held,** that there was sufficient evidence adduced

at the trial to take the case to the jury on the questions of fraud, and whether the defendant with knowledge thereof executed the promissory note sued upon.

(Syllabus by the Court.)

*Error from District Court, Comanche County; J. T. Johnson, Judge.*

Action by C. S. Wingate and another against S. P. Render. Judgment for defendant, and plaintiffs bring error. Affirmed.

*Stevens & Myers* and *Wright & Boyd*, for plaintiffs in error.

*Lydick & Eggerman* and *Ames, Chambers, Lowe & Richardson*, for defendant in error.

KANE, C. J. This was an action upon a promissory note, commenced by plaintiffs in error, plaintiffs below, against the defendant in error, defendant below. The petition is in the usual form. The answer, after admitting the execution of the note, set up as defenses: (1) Failure of consideration; (2) fraud on the part of plaintiffs in the procurement of the note; and (3) by way of counterclaim, that by reason of the fraud perpetrated upon him, defendant was damaged in the sum of $1,390.78, for which he prayed judgment.

Upon trial to a jury there was verdict for the defendant as follows:

"We, the jury, impaneled and sworn to try the issues in the above-entitled cause, do, upon our oaths, find for the defendant, S. P. Render, and assess his damages at $1.00, one dollar, and cancellation of the note dated October 1, 1908, for $7,686 and 35/100."

Thereafter judgment was rendered upon this verdict, to reverse which this proceeding was commenced. Hereafter the parties will be designated "plaintiffs" and "de-

fendant," respectively, as they appeared in the trial court; and the Arkansas Valley Coal Company, Limited, will be called "the company."

From the form of the verdict returned by the jury, it is apparent that they found in favor of the defendant upon the defense of fraud, and it is from that standpoint that we will review the proceedings of the court below. Counsel for plaintiffs present a great many grounds for reversal, many of them based upon misdirection of the jury, or the improper rejection or admission of evidence, or upon errors in matter of pleading or procedure, and all of them requiring such exhaustive examination of the record as to necessitate a review of all the evidence adduced at the trial. If we fail to notice in detail the assignments of error predicated upon errors of this class, it is not because they have escaped our notice, but because we are of the opinion, after an examination of the entire record, that it does not appear that the errors complained of have probably resulted in a miscarriage of justice, or constitute a substantial violation of any of the constitutional or statutory rights of the plaintiffs. The Supreme Court in every stage of an action is required by statute (sections 4791 and 6005, Rev. Laws 1910) to disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party. *Mullen v. Thaxton*, 24 Okla. 643, 104 Pac. 359.

The controversy herein arose out of the sale by the plaintiffs to the defendant of the good will and assets of a coal brokerage business which, prior to the sale, was conducted by plaintiffs under the name of Arkansas Valley Coal Company, Limited. There seems to be some controversy between counsel as to whether this company was a corporation or a partnership, but in the view we take of

the case we deem that question immaterial. It seems that the physical assets of the company consisted entirely of a small amount of office furniture and fixtures, and certain accounts which were due and owing to it by certain of its customers, which appeared upon the books as open accounts, while its liabilities consisted of sums due from it to certain individuals, banks, and other business concerns. Before the sale was consummated, the plaintiffs furnished the defendant an itemized statement of its assets and liabilities, which showed that its assets amounted to the sum of $20,572.41, and its liabilities to the sum of $18,504.41. By the terms of the sale, the defendant acquired the good will of the company and all of its physical assets, in consideration for which he paid $1,750, in cash, gave a promissory note for $8,494.45, and assumed the payment of accounts due by the company to various banks, persons, and business concerns in the sum of $10,128.94, the plaintiffs agreeing to pay the balance of such accounts in the sum of $8,494.45, the exact amount of the promissory note above mentioned. This note was dated Hartshorne, I. T., June 14, 1907, and was due on or before one year after date. Immediately upon the completion of the foregoing preliminaries the business of the company was transferred to the defendant, who thereupon turned the same over to one E. G. Hickey, who theretofore had been sales manager and vice president for the company, to take full charge thereof for and on behalf of defendant, he being a resident of Norman, Okla., and not purposing to give it his personal care and attention. After Hickey took charge of the business for the defendant he proceeded to transact its business for the defendant in the usual manner. He also collected part of the accounts which were transferred to the defendant as assets, made some payments upon the note, and payed off the liabilities which were assumed by the

defendant. In the meantime, certain of the accounts transferred to the defendant as assets remained uncollected, much to his dissatisfaction, and payments upon the note were not being made to the satisfaction of the plaintiffs. The defendant in one of his letters to Mr. Wingate, who always acted as spokesman for the plaintiffs, which was written in response to a letter requesting payment of the note, states his attitude toward these accounts as follows:

"Really, I am sure that you must have forgotten your signed statement to me with regard to these accounts. This statement was made at the time of the giving of the note. In this statement you certify as to the correctness of each and every one of these accounts. Of course, I had not kept the books, and had no way of knowing as to the accuracy of the accounts, or what claims might bob up against any of them. For this reason I had you certify as to the correctness of all of them. Now, as a matter of fact, under this statement, I think I could turn the whole batch back to you and have you to establish their correctness, as the burden is always on the one who asserts. But to protect all parties and show absolute good faith in the matter I have done what I thought best to establish the correctness of the accounts as you certified them to me. With this state of affairs you would hardly ask and expect us to pay out money and take chances on establishing the correctness of the account."

The plaintiffs' attitude toward the transaction generally is indicated by a letter written to the defendant by Mr. Wingate as follows:

"I have your letter of the 25th and am somewhat surprised at the position you assume in regard to the note due me from the Ark. Valley Coal Co. I would beg to remind you that I did not sell you any accounts. What I sold you was our stock in the Ark. Valley Coal Co., carrying with it all the assets and liabilities of the company as relating to such stock the same as if you were buying stock in any other corporation, and there is no similarity whatever be-

tween such a transaction and the land deals you compare it with."

The matter now had narrowed down to the foregoing accounts; all the other phases of the trade between the plaintiffs and defendant having been satisfactorily adjusted. Shortly after the passage between the parties of the letters from which the foregoing excerpts were taken, · the defendant discovered that the general financial affairs of the company in other respects were not in a satisfactory condition and decided to liquidate the same. In pursuance of this resolution, he intrusted the matter of liquidation to a Mr. Beatty, a man of considerable experience in that class of business.

At this time the payment of the promissory note and the collectability of the accounts again came on for consideration more acutely between the plaintiffs and the defendant, the defendant insisting as formerly that the payment of the note should not be pressed until the accounts were collected, and the plaintiffs insisting that the accounts were collectable, and that they could have been collected before, except for the carelessness and negligence of Mr. Hickey in the management of the affairs of the company. Finally, after many conferences between the plaintiffs and the defendant, the latter executed the note sued on herein for the exact amount of the uncollected accounts and accrued interest on the former note. The alleged fraud upon which defendant relied for a defense was that the plaintiffs represented to him that the accounts of the company transferred to him as assets were all valid existing accounts against solvent customers of the company, whereas the accounts that remained uncollected at the time the last note was executed were false and fictitious and were carried upon the books of the company and into the statement of its af-

fairs furnished the defendant for the purpose of deceiving him and inducing him to enter into the trade with plaintiffs; that these false and fraudulent representations were reiterated by the plaintiffs from time to time from the date of the trade until the second note was executed, and that up to that time the defendant believed such statements to be true, and was thereby induced, not only to make the trade originally, but also to execute the note which is now in controversy.

The only assignments of error going directly to the merits of the case are stated by counsel for plaintiffs in their brief as follows:

"We contend that demurrer to the evidence should have been sustained for two reasons: (1) Because if there was any fraudulent practices or false representations made at the time of the giving of the first note, the testimony of the defendant conclusively shows that he had full knowledge of it at the time he executed the renewal contract or note sued on, and therefore cannot set up fraud as a defense for the reasons heretofore stated; and, second, because the evidence produced by the defendant in support of his defense utterly fails to show fraud or false representations, and the most that can be said of it is that it shows a dispute about the amounts due on the accounts which he sets out in his answer as list No. 3."

There is no controversy between the parties as to the law governing the first subdivision of the assignment of error as stated above. They all agree that contracts induced by fraud are not void, but voidable, and that the defrauded party may elect, with knowledge of the facts concerning the fraud, to treat the contract as valid, and that if he does so, he cannot thereafter change his position and insist that it is invalid. *Skinner et ux. v. Scott et ux.,* 29 Okla. 364, 118 Pac. 394.

Therefore, the first question is: Was there any evidence adduced at the trial reasonably tending to show that the defendant did not know of the fraud of which he complained at the time he signed the second note, for it is settled that if he did, he will be regarded as having purged the contract of the fraud and cannot now rely upon it as a defense. 1 Daniel on Negotiable Instruments (5th Ed.) sec. 205.

After a careful review of the entire record we are of the opinion that this question must be answered in the affirmative. It may seem strange that during the more than fifteen months which transpired between the execution of the first and second notes the defendant did not discover the alleged fraud, if any existed; but we think there are special circumstances connected with this case which in a measure explain his unusual credulity. In the first place, the defendant and Mr. Wingate, who acted for both plaintiffs in the trade, were friends of many years' standing, and on that account the details of the business seem not to have been inquired into with that degree of care which usually accompanies a business transaction between parties dealing with each other at arm's length.

Another matter which evidently tended to allay any suspicion on the part of the defendant as to the good faith of the plaintiffs was that during the time Mr. Hickey was in charge of the business for the defendant he had come to the conclusion—justly we think—that Mr. Hickey was not only inefficient, but dishonest, and that a great deal of the trouble in relation to these accounts arose out of his dishonesty and mismanagement of the affairs of the company. That this impression was fostered and encouraged by Mr. Wingate is apparent by a conversation which took place between the defendant and Mr. Wingate about the

time the second note was executed, of which the defendant testified as follows:

"I told Mr. Wingate here over this note—I said here is ample funds from solvent concerns to secure it and if you will extend it I will collect this money, and he stated that Mr. Hickey had been drinking and gambling around in Eastern Oklahoma, and that if he had attended to your business all of these would be collected, and I says, 'I will assure you, Mr. Wingate, if you will treat me right and give me time on this I will collect these and make up the payment.'" "Q. And when Mr. Wingate reassured you at the time you made the note they were correct and you found out Mr. Hickey was a crook, you believed Mr. Wingate? A. I absolutely believed Mr. Wingate; he was my friend and associate and had no reason not to rely on him."

All of this evidence and a great deal more to the same effect tends to show that at the time the second note was executed the defendant entertained the belief that the collection of the accounts had been neglected by Mr. Hickey, and that while some of them were disputed and had become stale, they all could be collected by the exercise of proper care and attention. The defendant's unfamiliarity with the affairs of the company and his lack of knowledge as to these accounts is further explained by his evidence to the effect that immediately after taking over the business he placed the same in full charge of Mr. Hickey and did not exercise any supervision over it himself until immediately after the execution of the second note. We think the most that can be said of the evidence up to this point is that it tends to show that the defendant knew that some of the accounts were in dispute, not that they were false and fictitious, or that the defendant knew the books of the company and the statement furnished him had been padded.

We will now examine the second subdivision of this assignment of error and see what, if any, evidence there was to support the verdict of the jury on the question of fraud. That at the time the trade was made the plaintiffs represented the accounts to be correct and continued to do so up to the time the second note was made, and that they could have been collected, had it not been for the shortcomings of Mr. Hickey, there can be no doubt. The record shows that immediately after the execution of the second note, and after the defendant had placed Mr. Beatty in charge of the affairs of the company as liquidating agent, he personally instituted a vigorous campaign for the collection of the accounts, which resulted in failure. He testified that it was during this effort to collect that he discovered that the accounts were fictitious and fraudulent, and that thereupon he informed Mr. Wingate of his discovery. He says:

"I told Mr. Wingate that a personal investigation of these accounts after seeing reliable parties it indicated to me the most of them were spurious and they were not good."

In other words, the investigation developed that the accounts were not genuine, that the parties who appeared from the books and the statement of assets and liabilities to be debtors of the company were not indebted to it, and that in some instances the company was indebted to them. The evidence tending to show fraud on the part of the plaintiffs in padding the books of the company and the statement of their assets made for the information of the defendant is very voluminous and covers a wide range. It is true that some of it was introduced over objections by the plaintiffs, but as, in our judgment, it was all properly admitted, no useful purpose could be subserved by reviewing it at length. A wide latitude is allowed in cases of fraud, and circumstances altogether inconclusive, if sep-

arately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof. *Castle et al. v. Bullard,* 23 How. 172, 16 L. Ed. 424; *Leedom et al. v. Earls Fur. & Car. Co.,* 12 Utah, 172, 42 Pac. 208; 6 Enc. Ev. 22.

On the whole, we are entirely satisfied that there was sufficient evidence adduced at the trial to support the verdict of the jury and the judgment of the trial court entered thereon on the question of fraud. In reaching this conclusion we assume the soundness of the rule contended for by the plaintiffs, that to constitute actionable fraud, it must be made to appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; (6) that he thereby suffered injury; and (7) that all these facts must be proven with a reasonable degree of certainty, and all of them must be found to exist; the absence of any of them would be fatal to a recovery. 20 Cyc. 13.

Finding no reversible error in the record, the judgment of the court below is affirmed.

All the Justices concur.