## DE PRIEST et al. v. WELCH et al.

No. 9352—Opinion Filed July 23, 1918.

(174 Pac. 261.)

### Appeal and Error—Review—Equity Cases.

In an equity case it is within the power of this court to consider the evidence and render judgment thereon, but the rule is well established that this court will not interfere with the judgment of the lower court unless the same is not sustained by the weight of the evidence.

(Syllabus by Hooker, C.)

Error from District Court, Delaware County; John H. Pitchford, Judge.

Suit by Ausley A. Welch and another against D. F. De Priest and another. Judgment for complainants, and defendants bring error. Affirmed.

J. G. Austin and E. B. Hunt, for plaintiffs in error.

Ad. V. Coppedge and Bennett & Wilson, for defendants in error.

Opinion by HOOKER, C. This action was brought in the lower court by Ausley A. Welch and Bob Welch, defendants in error, against the plaintiffs in error, to cancel a deed theretofore executed by them to the said plaintiffs in error, for two reasons: First, that the same had been secured without any consideration therefor; and, second, that the plaintiffs in error had by conspiracy and fraud secured the deed from them conveying the land in controversy here.

The facts disclose that Ausley A. Welch and the plaintiffs in error were all residents of Grove, Okla., and that a short time before the execution of the deed in question they associated themselves together for the purpose of becoming interested in some mining property in the state of Missouri and agreed among themselves to go to that state and examine a lease known as the "Mitchell Mine," which they were informed could be purchased for the sum of $3,000; and it was further agreed that each of the parties was to contribute to that enterprise the sum of $1,000, and own jointly a one-third interest in said mine.

It was understood that Ausley A. Welch had no money, but in order to secure the payment of his $1,000, which amount was to be advanced to him by Holland and De Priest, he was to execute to them a general warranty deed to the land in question, which was intended to operate as a mort-

gage, and out of the proceeds derived from the operation of this mine he was to repay Holland and De Priest the amount of money thus advanced to him by them; that in order to consummate this deal his father deeded to him most, if not all, of the land involved here on the same day that he executed the deed in controversy here. In fact, the deeds were made at the same time, and the evidence discloses that, when the deed was executed by Welch and his wife to De Priest and Holland, he (Welch) demanded of either Holland or De Priest, in the presence of the notary before whom the acknowledgment to said deed was taken, that a contract be executed to him which stated the agreement that existed between him and the grantees in the deed; but the matter was postponed. Welch placed this deed in his pocket and, in company with the plaintiffs in error and one Harper, left Oklahoma for the purpose of inspecting the Mitchell mine in the state of Missouri, which they declined to purchase after inspection, and the parties then returned to Monett. In the meantime, Harper, in some way, became connected in the enterprise, and they made an agreement that they would purchase the "Navy Bean mine," which was an abandoned mining property likewise situated in the state of Missouri, and it was then and there understood and agreed between the parties that, if the Navy Bean mine could be purchased for $4,000, each of them would contribute $1,000 toward this enterprise, and Harper was delegated as the agent and the representative of the four for the purpose of buying this lease, and thereupon Harper returned and represented that he had purchased the mine, and, for a consideration of $1,000 to be paid by each, a one-fourth interest therein would be conveyed to the parties thus paying said amount.

It appears from the evidence that Harper did not pay anything for a sublease on this Navy Bean property; that the lease was held by a woman by the name of Mrs. Simpson, who was to pay to the owner a certain royalty from the mineral thereon, and that Harper purchased or acquired a sublease from her by agreeing to pay her an extra per cent. royalty; that the parties left the impression with Welch that a consideration of $4,000 was paid or to be paid by Harper to Mrs. Simpson for this lease, and, believing that fact to be true, he accepted an assignment of a one-fourth interest therein and delivered a deed to the real estate involved here to De Priest and Holland, and they at the same time executed and delivered to him two checks for $500 each, which were at the time indorsed

by Welch and returned to Holland; and the evidence here is sufficient to uphold the finding of the trial court that the parties who executed these checks received the same back, and in fact paid out no consideration therefor.

It was understood and agreed that Welch was to be in charge of the operation of this mine, and that his proportionate share of the operating expenses in developing the mine was to be by work in superintending the same, and thereupon De Priest and Holland gave him an axe for the purpose of developing this mine, and he did go thereupon and prepare some timbers necessary for said purpose, and that he ascertained the true condition of the title thereto, the consideration that had been paid by Harper therefor, and then called upon De Priest and Holland to execute to him a contract as agreed upon providing that this deed should be regarded as a mortgage which was to be paid out of the operations of the mine, which they declined to do, and he then and there instituted this action to cancel said deed for the reasons above stated.

It is further shown by the evidence that, about the time that the deal with Holland and De Priest and Harper was being made by Welch, some one, ostensibly for the purpose of inducing Welch to believe that there was a great bargain in the purchase of the Navy Bean mine, and as an inducement to make him execute an agreement and deliver his deed, sent him a telegram from Joplin, Mo., of date May 12, 1916, offering him $4,125 for his undivided one-fourth interest in said mine. The authenticity of this telegram has never been shown, but the trial court admitted the same in evidence, evidently as a part of the scheme to defraud Welch out of his property.

The trial court heard the evidence, and at the conclusion thereof found therefrom that Welch, De Priest, and Holland contemplated buying the Mitchell mine, each agreeing to pay $1,000 for their part of the purchase price, and that Welch in order to raise his $1,000 agreed with De Priest and Holland that, if they would furnish the money, he would execute to them papers securing the amount, and that it was understood that Welch should be permitted to repay this $1,000 out of the proceeds from the mine when the same got into operation, and that in pursuance to said agreement he executed the deed in question, and that after the execution of the deed and before its delivery they started out to view the Mitchell mine, at about which time one Harper associated himself with them; that upon investigation of the Mitchell mine they de-

termined not to accept it; that all of said parties returned to Monett and agreed to investigate the Navy Bean mine: and that Holland, De Priest, and Harper did investigate the mine, and upon their return stated that the Navy Bean mine could be bought for $4,000, and it was then agreed that each of the parties would put in $1,000, and that thereafter Holland and De Priest executed and delivered to Welch two checks for the amount of $500 each, and that these checks were turned back to Holland and plaintiff delivered the deed involved herein to the plaintiffs in error; that thereafter De Priest and Welch returned home, and Holland and Harper went to Joplin in order that Harper might buy the lease; that Harper procured the lease, which was examined by Holland, and on the face thereof it appeared that Harper had procured the lease for the consideration of 2 per cent. royalty only; and that Harper transferred a one-fourth interest therein to each De Priest, Holland, and Welch.

The court further found that the defendants De Priest and Holland sent Welch up to the Navy Bean mine with only an axe to operate the same; and the court further found that:

"This is one of the most perfect cases I have ever seen in court of what we called in the olden times 'snipe hunting.' Here is this young, inexperienced, Indian boy, absolutely knowing nothing at all about this proposition, falling into the hands of these men, who have attempted to fleece him; but fortunately for the plaintiff, before they could carry their plans into execution, this suit was filed and his interest in the land protected. This is one time where it affords the court pleasure to find that the deed was absolutely without consideration, and I do find from the evidence that it was without any consideration, and as a conclusion of law I hold that this deed ought to be canceled. It is therefore ordered, adjudged, and decreed by the court that the deed executed by the plaintiff to the defendants be declared absolutely null and void and the same is canceled."

And the court further found that under the proof there was a conspiracy between Harper, De Priest, and Holland, and that the checks given by De Priest and Holland to the plaintiff were turned over by the plaintiff to Holland, and that it was the understanding between Holland, De Priest, and Harper that De Priest and Holland would be protected by Harper.

We have read the evidence in this cause very carefully, and we unhesitatingly come to the conclusion that any judgment other than the one rendered by the trial court would sear the conscience of any chancellor trying the case.

Assuming that Mrs. Simpson had a valid lease upon this property, which is not shown by the record, Harper acquired the same by a 2 per cent. royalty. Harper was acting for the benefit of all four of these parties; in fact, as their representative. It was a joint enterprise, and whatever trade Harper made operated to the benefit of all of the parties here. By the payment of this royalty of 2 per cent., he acquired this lease; yet these parties required Welch to give $1,000 for a one-fourth interest in a lease for which he had paid his proportionate share of the consideration, when the same was assigned to Harper by Mrs. Simpson, for one-fourth of the increased royalty was deducted from his interest in the proposition. Then again, the evidence to our mind upholds the judgment of the trial court that Welch had the agreement with De Priest and Holland at the time this deed was executed that the same was to be construed as a mortgage and to be paid out of the profits from the operation of the mine, and that a contract was to be given to him stating that fact. This they refused to do when they acquired the deed, and he rightfully repudiated the transaction and refused to proceed further with it.

This court, in Hankins v. Farmers' & Merchants' Bank, 42 Okla. 330, 141 Pac. 272, says:

"In determining the existence of fraud, any evidence, direct or circumstantial, which is competent by other rules of law, and which in the opinion of the court has a legitimate tendency to prove or disprove the allegations in the issue, is admissible. Great latitude is allowed in the introduction of evidence, the extent of the investigation being largely in the discretion of the trial court, and objections to circumstantial evidence on the ground of irrelevancy are not favored. Circumstantial evidence to show fraud may well be admissible when taken as a whole, although some of the circumstances, considered separately, would be incompetent. The whole transaction involving the alleged fraud may be given in evidence."

And in the case of Wingate v. Render, 58 Okla. 656, 160 Pac. 614, the Supreme Court of Oklahoma said:

"A wide latitude is allowed in cases of fraud, and circumstances altogether inclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."

While this is an equity case and it is

within the power of this court to consider the evidence and render judgment thereon, still the rule is well established that this court will not interfere with the judgment of the lower court unless the same is not sustained by the weight of the evidence.

After a careful consideration of this entire record, we cannot say that the judgment of the trial court is against the weight of the evidence here; but, upon the contrary, we do say that judgment is supported by the evidence, and about that we have no doubt.

The judgment of the lower court is therefore affirmed.

By the Court: It is so ordered.