### MIDLAND VALLEY R. CO. v. GOBLE.

Nos. 10732, 9808—Opinion Filed Nov. 25, 1919.

Rehearing Denied Jan. 6, 1920.

Second Petition for Rehearing Denied Feb. 17, 1920.

(Syllabus by the Court.)

**1. New Trial—Grounds—Newly Discovered Evidence.**

A rule of wide recognition regarding the granting of new trials on the ground of "newly discovered evidence," exacts that the evidence fulfill the following require-

ments: (1) it must be such as will probably change the result; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be to merely impeach or contradict the former evidence.

### 2. Master and Servant—Presumptions—Fact of Injury.

While in the case of a passenger the fact of an accident carries with it a presumption of negligence on the part of the common carrier, a presumption which in the absence of some explanation or proof to the contrary is sufficient to sustain a verdict against it, for there is prima facie a breach of its contract to carry safely, a different rule obtains as to an employe. The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employe to establish that the employer has been guilty of negligence.

### 3. Same—Question for Jury—Sufficiency of Evidence—Negligence.

The evidence is examined and held to be sufficient to authorize the court to submit to the jury the question of the negligence of the defendant under all the circumstances proven in the case; and held, further, that a verdict finding the defendant guilty of negligence is supported by the weight of the evidence.

### 4. Appeal and Error—Review—Evidence.

The evidence is sufficient to sustain a judgment if there is any evidence whatever reasonably tending to prove either directly or immediately, or by permissible inference, the essential facts.

### 5. Same—Harmless Error.

After an examination of the entire record in this case, it does not appear that any error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of any constitutional or statutory right. (Harn v. Patterson, 58 Okla. 604, 160 Pac. 924.)

Error from District Court, Kay County; W. M. Bowles, Judge.

Action by M. T. Goble against Midland Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Defendant also brings error from action of court in denying petition for new trial on ground of newly discovered evidence. Actions consolidated. Affirmed.

O. E. Swan and Sam Sullivan, for plaintiff in error.

W. N. Maben and J. F. King, for defendant in error.

JOHNSON, J. This action was commenced by M. T. Goble, the defendant in error, in the district court of Kay county, Oklahoma, to recover $30,000 damages for personal injuries alleged to have been sustained by him while in the employ of the defendant by reason of the negligence of the defendant.

For convenience, the parties will hereinafter be referred to as "plaintiff" and "defendant," respectively, as they appeared in the trial court.

The essential allegations of the plaintiff's petition were as follows:

"That heretofore, to-wit: on the 8th day of February, 1917, at about the hour of 8.30 p. m., the plaintiff was employed by defendant as a switchman in the yards of said company in the city of Muskogee, Oklahoma, and plaintiff says that on said date it was a part of his duty as such switchman to take passenger train or motor car No. 3 which arrives at Muskogee, from passenger depot to the roundhouse, and plaintiff says that on said date after said passenger train or motor car arrived, he did take said train down to the roundhouse at about the hour of 8.30 p. m. down over and along the main line and it was taken from the main line to the coach track, and after reaching said coach track, plaintiff says that he delivered said motor car or train over to the hostler and the hostler's helper, whose names are unknown to the plaintiff. Plaintiff further says that after placing said train away, he lined up the switch for the main line, and at about said time, said train extra No. 15 was waiting to go north, and plaintiff says that it was his duty to mount said train and that it was the custom then in force in the yards of said company, a custom well known to the defendant, for all employes delivering said motor car or train to the roundhouse, to mount No. 15 or any other train which might be going north and plaintiff says he did mount extra No. 15 for the purpose of going from the roundhouse to the yards of said company. That said extra No. 15 started north and when the same reached a curve turning west at the 'Y' extra No. 15, and switch engine No. 100 with a string of cars attached, had a head-on collision.

"Plaintiff says that there were no lights on the engine of extra No. 15 and no whistle, but plaintiff says that this fact was unknown to him. That plaintiff had no knowledge of the defective condition of said engine or any warning thereof, and had no knowledge or warning of any impending danger. Plaintiff says that the engineer in charge of said extra No. 15 whose name is unknown to plaintiff, and the engineer in charge of said switch engine and string of cars whose name is unknown to plaintiff, negligently and carelessly allowed said engines to come together without notice or warning to this plaintiff. That the defendant railroad company and its agents and servants whose duty it was to see that its engines were in a proper state of repair, and properly equipped with proper head lights, and a whistle in order, negligently and carelessly

failed to inspect said engine or place the same in a reasonable safe state of repair as aforesaid, and that the negligence of said defendant railway company and its agents and servants whose duty it was to keep said engine on extra No. 15, in a proper state of repair, was and did constitute the proximate cause of plaintiff's injuries. Plaintiff says that he was at all times in the exercise of ordinary care and caution for his own personal safety, and was at a place where it was his duty to be and where he had a right to be and that the injuries hereinafter complained of were the proximate result of the negligence aforesaid.

"Plaintiff further says that when said engines came together he was caught between the tank and the cab of engine No. 15, and that his back, legs, hips and body were bruised, drenched, twisted and lacerated and that the nerves, muscles, and ligaments of his said back, hips and body were lacerated, bruised, contused and otherwise permanently injured. That his right knee was twisted, bruised and permantly injured. That his liver and bowels were mashed, bruised, contused and permanently injured. That his right leg was mashed, lacerated, and permanently injured. Plaintiff says that on account of all of said injuries, he had been unable to perform any class of physical labor, and that he is permanently disabled and permantly injured. That at the time of sustaining said injuries he suffered great physical pain and mental anguish, that he now suffers, and will ever suffer great physical pain and mental anguish as a result of said injuries. That at the time of sustaining the injuries aforesaid he was twenty-nine years of age and was earning the sum of $125.00 per month, and had a life expectancy of forty years. That his earning capacity is almost completely destroyed, and that on account of all the injuries so sustained, and his physical pain and suffering and his mental pain and suffering, and the physical and mental pain and anguish he will ever suffer in the future, he has been damaged in the sum of $30,000."

The defendant answered by a general denial and pleaded as a further defense contributory negligence of, and the assumption of risk, by the plaintiff.

The case was tried to a jury and resulted in a verdict in favor of the plaintiff for $5,000.

The case is here on two records; the main case being an appeal from the verdict of the jury and the judgment of the court, and the second, or supplemental record, from the refusal of the trial court to grant a new trial on the grounds of newly discovered evidence, which was taken subsequent to the lodging of the record of the main case in this court. They have been numbered on the docket of this court No. 9808 and No. 10832, respectively, and by agreement of the parties, the same were submitted together on briefs and oral arguments.

The defendant's specifications of error are:

(1) The trial court erred in overruling the demurrer of the defendant to the evidence of the plaintiff and in refusing to sustain same.

(2) The trial court erred in refusing to instruct the jury to return a verdict for the defendant.

(3) The verdict of the jury is not sustained by sufficient evidence.

(4) The verdict of the jury is contrary to the evidence.

(5) The trial court erred in giving to the jury instruction No. 5, of the instructions given by the court to the jury.

(6) The trial court erred in refusing to give to the jury instruction No. 6, requested by the defendant.

(7) The trial court erred in refusing to give to the jury instruction No. 7, requested by the defendant.

(8) The trial court erred in refusing to give to the jury instruction No. 12, requested by the defendant.

(9) The trial court erred in giving to the jury instruction No. 8 of the instructions given to the jury.

(10) The trial court erred in rendering judgment in favor of the plaintiff and against the defendant.

(11) The trial court erred in overruling the motion of the defendant for a new trial.

Counsel for the plaintiff in error have filed a second or supplemental brief in support of plaintiff in error's assignments of error that the trial court erred in overruling the defendant's petition or motion for a new trial on the grounds of newly discovered evidence.

The trial court heard evidence upon the motion and overruled the same. This evidence was largely cumulative and of an impeaching nature.

The litigated question in this case was, as to whether the plaintiff was injured at all or not, and if so, whether or not his injuries were serious and of a permanent nature.

Upon the trial before the jury the plaintiff was examined in chief and upon cross-examination, at great length and in great detail, testified that he was seriously injured in the back and lower limbs, and that he had never been able to perform manual labor since his injury up to the time of the trial and was still suffering great bodily pain as a result of his injury, and that prior thereto, he was an able-bodied, stout, robust man. One physician, Dr. Aiken, testified that he examined the plaintiff and that he found him

suffering from sciatica, and that it was probably of a permanent nature, and that ...ne same was probably caused from the injury received at the time of the accident.

The defendant offered as witnesses upon the trial before the jury five doctors, all of whom testified that they had examined the plaintiff and were unable to find anything the matter with him, two of whom testified, on the hearing of the motion for a new trial that a day or two after the trial they saw plaintiff in an automobile early upon a cold, rainy morning, in company with another gentleman and two ladies, and they were packed up, apparently starting upon a hunting trip. Upon the motion for a new trial the defendant offered as witnesses, the sister-in-law of the plaintiff and her sister, and one other party, who testified to having heard the plaintiff make statements after the trial of the case which tended to contradict the testimony of the plaintiff given on the trial, that he was injured. It also developed in that hearing that each of these three witnesses and the plaintiff had had a falling out and a dissolution of friendship since the trial of the main case, the two ladies over some family matters and differences, one of whom plaintiff had ordered out of his house, and the gentleman over a business matter concerning a popcorn wagon and machine that the witness had leased to the plaintiff.

This court, in the case of M., K. & T. R. Co. v. Taylor, 69 Oklahoma, 170 Par 1149, said:

"The granting or refusal of a new trial on the grounds of newly discovered evidence is a matter largely within the judicial discretion of the trial court, and unless it appears that such discretion had been abused, the ruling of the court will not be disturbed upon appeal."

Again, in Vickers v. Phillip Carey Co., 49 Okla. 231, 151 Pac. 1023, it was said:

"A rule of wide recognition regarding the granting of new trials on the ground of 'newly discovered evidence' exacts that the evidence fulfill the following requirements: (1) it must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be to merely impeach or contradict the former evidence."

We cannot say that the trial court abused his discretion in the matter of overruling the plaintiff's motion for a new trial on the grounds of newly discovered evidence. Plaintiff in error has made eleven assignments of error in its petition and all may be considered under two propositions. The issues of fact, including the alleged cause of negligence on the part of the railroad company, were found by the jury in favor of the plaintiff.

The first proposition to be determined is whether there was any evidence reasonably tending to support the verdict of the jury.

The plaintiff testified as follows:

"Q. What is your business?

"A. Switchman.

"Q. Were you working for the Midland Valley Railroad company in February, 1917?

"A. Yes, sir.

"Q. What business was you engaged in; in what department? What services were you performing?

"A. I was in the transportation department.

"Q. Were you switchman or brakeman?

"A. Switchman.

"Q. What are the duties of a switchman in the yards of the Midland Valley Railroad Company?

"A. There are several duties required of them on the Midland Valley. They are required to work with a switch engine in making up trains, and also required to do herding of passenger trains from the depot to the roundhouse. It is according to what job you are working on as to whether you are to do the herding; the long-field man does the herding as a rule. I was herding at that time."

He then testifies that on the evening of the 8th of February, 1917, he was working with the switch engine in the Muskogee yards and that he was instructed to take the motor car from the depot around the "Y" and take it to the roundhouse, and that the hostler and the hostler's helper were with him in the motor car; that the switchman "goes around and herds them around and turns the switches and takes it to the roundhouse" and that he took that motor car down from the depot to the roundhouse, about a mile, that evening. He testified that it was "the custom to ride back on anything that is coming up; an engine, a train, a passenger train, or anything that happens to be returning up to your work." That the motor car was taken from the depot to the roundhouse every evening and turned on the "Y." That it was his duty as long field switchman to do this; and as he threw the switch, there was an extra engine No. 15, with a train of cars, moving up towards the depot, about 45 feet from him and which he noticed for the first time.

The headlight of this engine was either out or covered, he did not notice which, so that it did not show any light. At this point there is a curve in the tracks and he was standing down between the engine and the tender at about the point where the fireman shovels the coal into the engine. He did not know that there was anything the matter with the engine or any defect in it. The engineer was at his post and the two firemen were sitting up at their place on the left-hand side of the engine. They had not gone very far up in the yards before he saw the fireman jump and, to use his own words, "I thought there was something wrong and I stepped over to the side between this tank and the cab just as they hit."

He testified that no whistle and no bell on either train was blown or rung, and no warning of any kind given; that the engine on which he was riding going west was struck by the switch engine of the company with cars which were going east, and that this switch engine, which had an electric headlight burning, was going at about five miles an hour; that the impact of these two trains coming together, head-on, broke both ends of the engines, and ran a flat car—there was a switch engine, a caboose and then a flat car, —the flat car "pulled right through the caboose and cut it down like you would cut grass down, and the tank and engine and cab came together and mashed me, and the next thing I knew I was down this twenty-foot embankment." "Well, I finally raised up, and Sabers, the night yard man, came up and says 'was there anybody hurt,' and Goble relied, 'I don't know who else is hurt.' * * * I crawled upon the bank and there was a fireman, one of the firemen was injured and he crawled upon the bank where I was after a while." In about twenty minutes the engineer Saber came "and I asked him what. was they going to do, leave me lay there all night in that condition?"

He testified the switch engine was all mashed up, and they went and got another eng'ne. and carried him over and put him in it. and took him to the yard office, and then he was taken to his home. and they "carried me in and put me on the bed" and they called Dr. Vallentine, the company's doctor. "He came and just examined me a little bit; I told him my back was in awful bad shape, so he sent some liniment down for me and told my mother to put hot salt and hot applications to my back and limb, and she did." That he was the only company doctor who ever called upon him, and he testified, "I was injured all through the back and this (right) limb, and though he called the com-

pany's doctors repeatedly for attention they did not come to him. He testified, "my ankles were sprained and my back hurt, my leg was hurt and knee, and I was in a very bad condition." * * * "I have suffered pain ever since that time."

"Q. Where do you suffer pain, Mr. Goble?

"A. In my back and hip and leg."

That he suffers pain underneath in the middle of the leg and it runs back to his "hip and up my back and spine." That he suffers under the knee of the right leg and back to his hip and spine. That he feels a little better in nice weather; "but in damp weather I am in an awful condition and unable to get out lots of times," and he cannot do any work at all. That exercise strains him and he can't stand a strain. That he was thirty years old, and was earning at the time of the injury from $125.00 to $130.00 a month; that he was not able to resume his duties, and previous to this injury his health and ability were good, that there was nothing the matter with him.

W. F. Simpson, road foreman of engines, testified that it was the universal practice of the boys to catch and ride any train or engine coming in and ride from the round-house up to the yards.

The testimony of the engineer in charge of the freight engine, as to the condition of his engine and as to how the wreck occurred, did not conflict with the testimony of the plaintiff, but fully corroborated it.

Dr. S. W. Aiken was called as witness for the plaintiff, and after testifying that he had examined the plaintiff on Saturday afternoon before the trial, and that he found the patient suffering from sciatica, he was asked:

"Q. What may cause sciatica, Doctor?

"A. Well, there are several causes. It may be caused by traumatism, that is, an injury of some kind to the back or to the nerve itself. or any injury over the nerve which would injure the nerve. It may be caused by what we call auto-intoxication, that is, poison secreted by the system if it is not excreted, the system absorbs the poison, or it may be caused by some inflammatory condition of the nerve itself, by some tumor pressing on the nerve; possibly an internal tumor that you can't see on the outside, or it could be caused from pressure on the outside.

"Q. Now, Doctor, taking this case, where the party was injured about the 8th of July, 1917, and who suffered with his limb up until the time you examined him, and taking into consideration, Doctor, your examination of this plaintiff, from what you discovered. I will get you to state whether or not that

condition you found there is permanent or temporary?

"A. Well, from the history of these cases of sciatica, his would be about the same as others. As a rule, they sometimes improve considerably for a time before a relapse; they might improve for several months and from some cause, unpreventable by the patient, there might be an overexertion or a straining of himself, or taking cold, or numerous causes; a bad malaria, probably malarial poisoning would bring it back, and it might be there the second time a month or two months or three and then get better and be back and forth for a number of years. They hardly ever get entirely well. It may recur for a number of years off and on.

"Q. Is there any remedy or cure for rheumatism that you know of, that is, sciatica rheumatism, any cure for that sciatica nerve?

"A. No, there is no specific cure for that; time and good nursing and the patient taking first-class care of himself is the only treatment.

"Q. What is the usual treatment for an injury to the sciatic nerve or the nerves of the back?

"A. Well, rest is one of the principal treatments, counter-irritation is used by a great many.

"Q. Explain what you mean by counter-irritation.

"A. Well, counter-irritation would be, for instance, the putting on of a mustard plaster. Another treatment is hot applications applied off and on; either hot salt or hot water, a bag with hot water in it or a hot flannel; an application that would be convenient.

"Q. These are the usual treatments that are given for nerves that are injured?

"A. Yes, sir; these are some of the treatments. There are probably other treatments different physicians use.

"Q. From the condition that you found the plaintiff in, Doctor, I will get you to state whether or not he would be in a position to perform physical labor?

"A. No, he is not able to perform physical labor, I should judge.

"Q. Would his condition interfere with him in any way in the performance of physical labor?

"A. His condition would interfere with it now. The condition he is in now, he is not able to perform physical labor where he would have to use his limb; in any labor where he would have to use his limb, he could not perform physical labor.

"Q. Is there any way that you could determine when, if ever, he would recover from that condition?

"A. No, there is no way I can determine that, nor I cannot say that he will ever entirely recover. He may recover apparently and be practically well for some time and then it is liable to come back, relapse.

"Q. Is his condition such, Doctor, that over exercise would cause him physical pain?

"A. Yes, sir.

Dr. A. D. Stocks testified for the defendant company that he had examined the plaintiff and found nothing the matter with him; that he took an X-ray photograph of the parts of his body claimed to have been injured, and that such photograph did not disclose any injury.

Doctors H. T. Ballentine, Sesslor Hoss, H. C. Montague and Henry C. Rogers all testified for the defendant and each testified that they could not find that the plaintiff had been injured, and each gave it as his opinion that the plaintiff had not been injured.

It is not disputed in the evidence that the relation of master and servant existed between the parties at the time the alleged injury occurred. There is likewise no dispute in the evidence that the wreck occurred in the yards of the defendant, substantially as alleged by the plaintiff in his petition, as his testimony and that of the engineer in charge of the freight train are not in conflict on that question and the defendant offered no testimony to the contrary.

The testimony was conflicting as to whether or not the plaintiff was injured and as to the extent of his injuries. The only other question that is necessary to be determined is, did the instructions of the court properly present these issues to the jury for their determination?

The defendant requested the trial court to give certain instructions, 19 in number, all of which were refused. Of the action of the court in this respect, the defendant complains.

We have carefully examined these instructions and find that the trial court committed no error in refusing the same for the reason that such of the instructions as the defendant was entitled to, were fully covered by the court in its general charge to the jury, and therefore he committed no error in refusing the same.

Counsel for plaintiff in error in their brief in support of proposition 3, contend that the trial court erred in giving to the jury instruction No. 5, which is as follows:

"You are instructed, gentlemen of the jury, that if you believe from a preponderance of the evidence that switch engine No. 15 and engine pulling freight train No. 100, col-

lided and ran into each other, said facts make out a prima facie case of negligence on the part of the company, its servants and employes, and casts upon the company the burden of showing that it was not negligent in the running of its trains and engines as complained of in this case."

We agree with counsel for the plaintiff in error that this instruction was erroneous for the reason stated by counsel, that the rule therein stated does not apply in a case where the relation of master and servant exists. Mid. V. R. Co. v. Graney, 77 Oklahoma; Phoenix Printing Co. v. Durham, 32 Okla. 575, 122 Pac. 708; M., O. & G. R. Co. v. West, 50 Okla. 521, 151 Pac. 212; C., R. I. & P. R. Co. v. Nagle, 55 Okla. 235, 154 Pac. 667. But in view of the fact that the wreck in question did occur through the negligence of the defendant in the way and manner alleged by the plaintiff, in his petition, and as clearly established by the testimony offered by the plaintiff, and the defendant offered no testimony disputing that of the plaintiff on that question, and in view of the fact that the court in paragraphs 2, 4 and 6 of the court's charge to the jury placed the burden upon the plaintiff to establish negligence on the part of the defendant, in which the jury was told that "negligence was never presumed but must be proven by a preponderance of the evidence, and that such negligence was the proximate cause of his injury; that the fact the plaintiff was injured is no proof of the negligence on the part of the defendant; that the evidence to justify a finding of negligence must show a breach of duty on the part of the defendant such as a reasonable person would have foreseen, as a natural consequence, would cause an injury, and that whether or not the defendant was guilty of negligence, depended upon the question whether it exercised reasonable care under circumstances existing at the time, and not whether it had done everything which it is possible to do in the light of every possible danger which might arise"; and the further fact that the court charged upon the question of contributory negligence of the plaintiff and the assumption of risk by him—we therefore conclude that the giving of instruction No. 5 did not probably result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right of the defendant and was therefore harmless error. Rev. Laws 1910, sec. 6005; Harn v. Patterson, 58 Okla. 604, 160 Pac. 924; Wingate v. Render, 58 Okla. 656, 160 Pac. 614; St. L., I. M. & S. R. Co v. Cantrell, 63 Oklahoma, 164 Pac. 110; Armstrong v. Poland, 56 Okla. 663, 156 Pac. 220.

What we have just said concerning the

giving of instruction No. 5, applies also to the contention of counsel for plaintiff under proposition 4, which is that:

"The trial court erred in refusing to give the jury instructions Nos. 6 and 7 requested by the defendant"

—which go to the question of contributory negligence, and also applies to the complaint of counsel that the trial court erred in refusing to give to the jury instruction No. 12 requested by the defendant, which goes to the question of the burden of proof upon the plaintiff to prove that he was injured.

The next complaint of the plaintiff in error is that the trial court erred in giving to the jury instruction No. 8, which is upon the question of the measure of plaintiff's damages, which instruction is as follows:

"If you find for the plaintiff in this case, in assessing the damages which he is entitled to recover, the jury should take into consideration his age, experience, habits, health, bodily qualifications, his life expectancy, his occupation prior to his injury, the extent of his injury, his ability at that time to perform labor, the pain and suffering he endured, his mental anguish, whether his injuries are permanent or otherwise, and the character of the same, and award him such sum or sums as you believe will reasonably and fairly compensate him for the damages sustained."

We think it is obvious from an examination of this instruction, that there is no merit in the defendant's contention that the same is erroneous.

We have carefully examined the instructions of the court and are of the opinion that the same taken as a whole, fairly presented the issues in the case to the jury and are not subject to the criticisms and objections urged by counsel for plaintiff in error in their brief.

We have carefully examined the whole record, together with the briefs of counsel, all of which have been carefully considered, and while it is true that upon the question as to whether the plaintiff was injured, and the extent thereof, the evidence is conflicting, we find that the evidence offered by the plaintiff reasonably tends to support the verdict of the jury and that, according to the well-established rule as announced in numerous decisions of this court, the same will not be disturbed. Smith v. Starr Mercantile Co., 54 Okla. 502, 153 Pac. 1188; Linkhart v. Kirkhart, 54 Okla. 699, 154 Pac. 645.

The judgment of the trial court is affirmed.

OWEN, C. J., and KANE, HIGGINS, and BAILEY, JJ., concur.