## WOOLLEY et ux. v. SIMPSON et al.

No. 27895.   Jan. 24, 1939.

Rehearing Denied June 6, 1939.

C. T. Huddleston and W. E. Utterback, for plaintiffs in error.

Anglin & Stevenson and Busby, Harrell & Trice, for defendants in error.

HURST, J. This is an action to cancel certain oil and gas conveyances on the ground of fraud in their procurement. The plaintiffs, W. W. Woolley and Lillie B. Woolley, husband and wife, were the owners of a 385-acre tract of land in the vicinity of the "Fitts" oil pool in Pontotoc county. They sued R. W. Simpson, L. H. Harrell, W. B. Osborn and his wife, Jewell Hope Osborn, and also the Amerada Petroleum Corporation, on the ground that by fraudulent misrepresentation they had been induced to convey an undivided one-half interest of the "royalty" under a 250-acre tract, another undivided one-half interest of the "royalty" under a 60-acre tract, and an oil and gas lease covering another 140-acre tract. At the commencement of the trial, upon opening statement of counsel, their action was dismissed as to defendants L. H. Harrell and the Amerada Petroleum Corporation. The trial proceeded against Simpson, Osborn, and Osborn's wife. At the close of all the evidence, the trial court made findings of fact and conclusions of law and rendered judgment in favor of the defendants. The plaintiffs bring this appeal.

The record discloses the following facts: Osborn was the president of the Fleetborn Oil Company. He called Simpson to his office and asked if he would undertake to purchase a lease and royalty from the Woolleys and authorized Simpson to pay $14,000 for a 140-acre lease and a half interest in 250 acres of royalty. On July 18, 1934,

Simpson went to Woolley's home and ascertained from them that their property was encumbered by a mortgage in the approximate sum of $17,000, and that plaintiffs wanted to sell a lease and enough royalty to pay the mortgage, and no more.

Plaintiffs testified that when they asked who was going to buy the acreage, Simpson told them it was "a major company, one which had not been in that field prior to that time", and that they then asked if it was the Fleetborn Oil Company, to which Simpson replied it was not. Simpson, however, denied that he made such statement, and testified that he told them the purchaser was to be a "responsible company", and that he had in mind the Fleetborn Oil Company, but told plaintiffs that he was not permitted to disclose the name. It appears from plaintiffs' testimony that their reason for inquiring about the purchaser was to insure development, and they admitted that the Fleetborn Oil Company, which was at that time operating a well on their premises, "has developed all right", and "so far as I know they are a major company".

Simpson reported back to Osborn, and Osborn raised his offer to $15,000, and on July 19th Simpson again approached the plaintiffs, and, after discussing the mortgage, Simpson advised plaintiffs that he thought Osborn would pay $17,000 for certain acreage which he proceeded to mark out on a map. When he came to the royalty under the 60-acre tract, plaintiffs objected, but Simpson said that is what it would take, so plaintiffs told him "if it would take that to make up the loan, I guessed it would have to go". Upon being asked what Simpson was getting out of the deal, he said a 5 per cent. commission. It also appears that Simpson told plaintiffs that "Mr. Osborn will pay for this". The deal was not then consummated, but Simpson left with the understanding that if plaintiffs agreed, he was to come back. Simpson reported to Osborn and he agreed to pay $17,000 only if they included the royalty under the 60-acre tract, and they could "take it or leave it". That evening and early the next morning plaintiffs called two of their friends, Mr. Kitchel and Mr. Sledge, both experienced oil men and who were acquainted with the property in that vicinity, and they came the next day, July 20th, a few minutes before Simpson arrived. Simpson brought three instruments: a mineral deed covering an undivided one-half interest in the 250-acre tract made out to Osborn as grantee, another mineral deed covering an undivided one-half interest in the 60-acre tract made out to Simpson as grantee, and an oil and gas lease covering

the 140-acre tract made out to L. H. Harrell, Osborn's attorney. After Mr. Sledge had ascertained that the mortgage company would accept $16,000 in full payment of the loan, and after some conversation, plaintiffs examined the instruments and executed them. Subsequently, after a settlement had been made with another party who held an option to sell the mineral interests in said land, plaintiffs' mortgagee received $16,000 and plaintiffs received $1,000 by check from Osborn. Simpson received a commission of approximately $800.

It appears that during the conversation on July 20th, both Kitchel and Sledge advised plaintiffs to make the deal. Plaintiffs consulted with these men out of the presence of Simpson, and plaintiff, Mr. Woolley, admitted that he did not take Simpson's word for it, but advised with his two friends. He stated that it was "somewhat" on Kitchel's advice that he made the deal. Plaintiff, Mrs. Woolley, testified that "I told Mr. Simpson when he was there I wouldn't sell, or sign any papers, without talking to some one we felt was really our friend. He said, 'fine' ". She further testified that she said: "Mr. Kitchel, I have always had a lot of confidence in you", and further, "I want you to advise me just like you would a sister".

Defendant Osborn testified that at the time the deal was made he was dealing for the Fleetborn Oil Company, but between 48 and 72 hours later he started dealing with the Amerada Petroleum Corporation, with the result that he sold them the royalty interest taken in his name and the lease taken in his attorney's name for the sum of approximately $19,000. Assignments were made on July 23rd, and Osborn received a commission of approximately $900. These instruments were not recorded until about August 14, 1934. He testified that "my reason for not keeping it for Fleetborn was we got afraid of it and I sold all the royalty and the lease, except this 30 acres".

All the defendants testified that neither Harrell nor Simpson acquired any interest in the property by the instruments taken in their name, but the instruments were so taken upon advice of counsel and in order to prevent a merger of estates and "keep a merchantable title." However, on November 13th, Simpson conveyed to Osborn's wife a half interest in the royalty under the 60-acre tract, leaving the other half interest in Simpson, in consideration, so both Simpson and Osborn testified, of the satisfaction of a debt owed by Osborn to Simpson arising out of other matters.

It appears from the record that plaintiffs learned "some few weeks or several days" after the recording of the instruments to the Amerada on August 14th, that the interest in the 60-acre royalty had not also been conveyed. But the record also shows that "a week and a half or two weeks" after the deal was made on July 20th, plaintiffs became dissatisfied and, according to Mr. Woolley's testimony: "I was dissatisfied. I hadn't been able to look after my interest and there was an immediate boom." Mrs. Woolley was asked this question: "If you did not know it had not all gone to a major company, this 30 acres (one-half interest in the 60-acre royalty) the well was on, why were you mad before you found out about that?" Answer: "The values had increased, of course. We found out later about the well on the field and we felt these men knew about that and bought this lease and we did not learn about it until afterwards."

1. There is no serious controversy between the parties as to the law applicable to this case. Both parties refer to the rule stated in Wingate v. Render (1916) 58 Okla. 656, 160 P. 614, and others of a similar nature, enumerating the elements necessary to be proved to establish actionable fraud. Each asserts that the evidence does or does not establish such fraud, according to their different theories. However, the cited case is an action in deceit for damages, and the present action is one for rescission and cancellation of instruments. Although fraud may be sufficient to give the defrauded person the right to sue either for damages in an action of deceit, or its equivalent, or to enable the defrauded person to rescind the transaction, yet the requirements of the law for these two purposes are not always identical. Williston on Contracts, vol. 5, sec. 1487. For the purposes of this opinion it is unnecessary to enter into a discussion of the distinction between such actions, but it is sufficient to say that in order to rescind a conveyance as against the immediate grantee, the grantor must show that he was induced into making the contract by reliance upon misrepresentations where he would not otherwise have done so but for such representations. Melton v. Whitney (1933) 164 Okla. 220, 23 P.2d 660; Berry v. Stevens (1934) 168 Okla. 124, 31 P.2d 950; 4 R. C. L. 494. Such misrepresentations must, of course, be material, but if the misrepresentations did in fact cause or induce plaintiffs to execute the instruments, they will be deemed sufficiently material. Williston on Contracts, vol. 5, sec. 1490. Therefore, we must examine the evidence in connection with the following considerations:

(1) Were the representations of defendant Simpson false? (2) Did plaintiffs rely upon the representations made by Simpson? and, (3) Did the representations made by Simpson, alleged to be false and alleged to be relied upon, induce plaintiffs to execute the instruments in question, where they would not otherwise have done so?

It may be well to state at this point that other than the agency theory discussed below, there is no contention that any confidential or fiduciary relation existed between the parties, nor that defendants had any superior or special knowledge regarding the oil development in the vicinity or the value of the property sold. In fact, it is not contended that plaintiffs did not receive a fair consideration for the interest conveyed according to the values at that time.

(a) Regarding the first consideration, the trial court found that "no fraud was practiced or misrepresentation of any material fact made to plaintiffs." Plaintiffs, in their original brief, rely upon the following theory: That Simpson, as the agent of Osborn, represented to plaintiffs that he was acting for a major oil company which was not operating in that field; that plaintiffs told Simpson they did not want to sell to an individual or to a company operating in the field, and Simpson assured them that the property would not go to the Fleetborn Oil Company, which was operating in the field, and that it would take all of the property conveyed by plaintiffs to raise $17,-000; and that these representations were false.

Plaintiffs, in their reply brief, advance the further theory that Simpson and Osborn had already made the deal to sell the lease and the half interest in the 250-acre royalty to the Amerada Petroleum Corporation for a sum in excess of $17,000 before Simpson made the deal with plaintiffs, and therefore the representation by Simpson that it would also take the royalty interest in the 60-acre tract to raise $17,000 was false.

Plaintiffs also advance, in their reply brief, the further theory, contrary to their contention in their original brief, that Simpson was the agent of plaintiffs and therefore a fiduciary relation existed, and Simpson, acting as agent for both parties, could not acquire any interest in the property.

But the record does not bear out plaintiffs' theories without contradiction. As to the first theory, although plaintiffs testified that they did not want to sell to the Fleetborn Oil Company, there is no evidence to show that they communicated that fact to Simpson. He denied that he mentioned the Fleetborn Oil Company. His testimony was that the Fleetborn Oil Company was the "major" company he had in mind, and considering the testimony of Osborn, the representation that it would take all the property conveyed to raise $17,000 was not false. As to the second theory, the testimony of Osborn denies that defendants Simpson and Osborn already had made the deal with the Amerada Petroleum Corporation before dealing with plaintiffs. The only evidence to support this theory is the circumstantial fact that the Amerada Petroleum Corporation paid Osborn before Osborn paid plaintiffs. The trial court found the situation to be:

"The court further finds that at the time of the original purchase, W. B. Osborn was negotiating for the property through R. W. Simpson for the Fleetborn Oil Company, of which he was president, but that later the officers of the Fleetborn Oil Company decided they did not want the property and Osborn then sold the royalty in his name and the lease in the name of L. H. Harrell to the Amerada Petroleum Corporation, and that R. W. Simpson, his agent, was of the opinion that the purchase was being made for the Fleetborn Oil Company.

"The court further finds that the sale to the Amerada Petroleum Corporation was made after the purchase by W. B. Osborn, through R. W. Simpson, on the 20th day of July, 1934."

Also, as to the third theory, that Simpson was the agent of plaintiffs, such agency asserted to be implied from the circumstances, the trial court found adversely to the contention of plaintiffs, in that:

"The court further finds that R. W. Simpson was acting as the agent of W. B. Osborn and that he was being paid and was paid a commission in said sale of approximately $800."

Since this is a proceeding in equity, this court will examine and weigh the evidence, but the findings and judgment of the trial court will not be disturbed on appeal, unless it is made to appear that such findings and judgment are against the clear weight of the evidence. Melton v. Whitney, supra.

The trial court has a decided advantage in passing on the testimony of witnesses who appear before him in person, as he sees them and observes their demeanor while on the witness stand. We, of the reviewing court, read the printed record of the testimony, but are denied the privilege of observing the witnesses while testifying, and therefore, due deference is given to the trial court's findings on controverted questions of fact. We have carefully read the record

and have stated the facts above in considerable detail. Considering all the evidence, we cannot say that the findings and judgment of the trial court are against the clear weight of the evidence.

(b) In addition to the above, we think the plaintiffs failed in their proof respecting the second element necessary for rescission —that of reliance upon the representations of Simpson. It is undoubted that reliance upon the alleged false representations by the one claiming to be defrauded is essential for relief. Williston on Contracts, vol. 5, sec. 1515. The trial court found that plaintiffs "did not rely solely upon the statements of R. W. Simpson or any of the defendants before making this transaction, but sought and secured the advice of those experienced in the oil business in the Fitts Oil Field, to wit: Mr. Kitchel and Mr. Sledge." As pointed out in the statement of facts above recited, this finding is supported by abundant evidence. In 12 R. C. L. 357, it is said that "one is not entitled to relief on the ground of false representations where, instead of relying upon them, he relied * * * on the advice of third persons." Plaintiffs' contention in this regard is that Kitchel and Sledge were given the same information and representations by Simpson as he gave plaintiffs, and therefore reliance on their advice was immaterial. But the record does not disclose that any misrepresentations were made to these third parties.

It would serve no useful purpose to discuss the third element—the inducement for entering into the contract—in view of the fact that plaintiffs have failed to show that the representations were false and relied upon.

Affirmed.

BAYLESS, C. J., and CORN, GIBSON, and DANNER, JJ., concur.