**FOLSOM MORRIS COAL MINING CO. v. FAUTT et al.**

No. 11300—Opinion Filed July 24, 1923.

**1. Evidence—Sufficiency.**

The evidence is sufficient to sustain a judgment if there is any evidence reasonably tending to prove the essential facts.

**2. Master and Servant—Action for Death of Miner from Explosion—Sufficiency of Evidence.**

Record examined, and held, there was evidence before the jury reasonably tending to support the verdict.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Coal County; J. H. Linebaugh, Judge.

Action by Mollie Fautt et al. against Folsom Morris Coal Mining Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

George Trice, for plaintiff in error.

A. T. West and P. E. Wilhelm, for defendant in error.

Opinion by RAY, C. Mollie Fautt, for herself and as next friend of her two minor children, recovered a $2,500 judgment against Folsom Morris Coal Mining Company, for the death of her husband, John Fautt, who was killed in an explosion in the defendant's coal mine No. 6, at Phillips, in Coal county. The defendant appeals.

The only question presented for consideration is the sufficiency of the evidence to support the verdict of the jury. The established facts are that John Fautt was employed as shot firer in the company's mine No. 6; that as such shot firer it was his duty to go into the mine when all other persons were out of the mine and fire the shots; that as such shot firer he was the sole judge whether a shot was a practical shot and whether or not it was safe to fire the shot; that on the 8th day of January, 1918, as such shot firer, he went into the mine for the purpose of firing the shots; that after firing certain shots there was an explosion which resulted in his death; that after the explosion, parties went into the mine and found him lying on his back in the 11th north entry.

It is alleged in the petition that the shot in one of the rooms ignited the coal dust or combustible matter in said room, thereby causing an explosion which drove the noxious gases and deadly fire into the 11th north entry, thus burning, asphyxiating, and killing said John Fautt; that his death was due to certain negligent and careless acts of the defendant company, all of which concurred and co-operated to produce his death, as follows: In allowing and permitting the air in the mine to become saturated with coal dust; in not sprinkling such entries, rooms, and slopes regularly and thoroughly with water so that the air would not be charged with such dust; in permitting the air in the room to become saturated with dust and combustible matter, and failing and refusing to remove the same from the mine; in not having sufficient current of air in and through and to the mine, slope, entries, roadways, and rooms to remove such combustible material with which the air was saturated from said mine; in allowing and permitting the said John Fautt as shot firer to go into the mine when same was in a dangerous condition; and in failing and refusing to remove the coal dust from the entry and rooms and allowing an accumulation of the same therein. The defendant answered by

a general denial and pleaded the assumption of risk and contributory negligence.

It is agreed that the death was caused by the explosion. The plaintiffs tried it upon the theory that it was a dust explosion caused by the negligence of the company in permitting dust to accumulate in the entries and in the rooms. The defendant tried the case upon the theory that it was not a dust explosion, but that it was an explosion caused by the two shots in the face, one being a following shot, which was at right angles to the shot on the right hand side of the room; that a portion of each of these shots kicked back, and the fire and coal dust from these shots crossed each other in about the center of the room and the explosion was the result.

There being no one in the mine at the time of the explosion but the deceased, parties and the witnesses necessarily reached their conclusions as to the cause and character of the explosion from an examination of the conditions in the entry and in the rooms after the explosion. These observations were made by the various witnesses, one, two, three, and four days after the explosion.

Four witnesses, all experienced miners, testified for the plaintiffs. The material parts of their testimony relating to the accumulation of dust in the mine, their opinion as to the character of the explosion and as to whether or not the shots in the room where the explosion started were practical shots, will be quoted.

Both parties tried this case upon the theory that the explosion started in the room worked by Homer Miller, which was room 11, off the 11th north entry. These entries and rooms were merely narrow, low roofed tunnels. Room No. 11 was a tunnel about 8 feet wide and 4½ feet high, leading off from the 11th north entry. It was about 150 feet long to where it widened out into a room about 17 feet wide and it was in that room, according to the theory of the parties and all the witnesses, that the explosion started. They all agree that three shots had been fired in that room. The controversy and the different opinions as to the character of the explosion were upon the interpretations of the different witnesses upon the conditions they found in this room No. 11 and the openings leading away from it.

Henry Parish on direct examination testified:

"Q. Do you know whether or not there was any accumulation in that north entry there? A. There was quite a bit of accumulation of dust. Q. Had that dust ever been removed from there? A. Not in quantities at all. Q. Had it ever been dampened? A. No, sir. Q. How long have you been a miner? A. I commenced in the mine before I was 13. Q. Have you followed that all your life? A. Been 3 years I was out. Q. What different positions have you had in the mine? A. I have had about everything that there is, drove, dug, drove the rope, been gas man. Q. What kind of explosion in your judgment was that on that occasion? A. It was a dust explosion. Q. Now, in this particular room you speak about, did you examine where the shots was put in? A. Yes, sir. Q. I will ask you to state from your experience as a miner whether or not they were practical shots? A. Yes, sir; they all pulled; there was one of them that required a little digging, but they expect that."

On cross-examination he admitted that he had been in only one dust explosion; that he saw the effects of this explosion for 1,000 feet towards the hoisting shaft; that its most extreme part was about 300 feet; that it traveled with the air a short distance and then against the air; had never seen a dust explosion in large force.

"Q. You say there was evidence of great violence there? A. There was commotion in the room, but the shots were in good shape. Q. They had all pulled the normal quantity of coal out? A. They didn't as good as could have been expected of those shots. Q. All those or a shot? A. All those shots. Q. All those three that were drilled? A. There was not a one that was an unpractical shot. * * * Q. Did you see any dust in this room? A. Yes, sir. Q. Dust on the floor of the room? A. Yes, sir. Q. Much? A. No, not any great amount. The shots had not tore the coal up so bad. Q. I was talking about the dust on the floor of the room? A. There was some. Q. Any dust in the entry? A. Yes, sir, some. Q. Considerable quantity? A. No great amount. Q. On the floor? A. Yes, of course it would not be on the roof. Q. What quantity was there on the floor of the room, the entry? A. I did not measure it."

Robert Fisher testified:

"Q. What various positions in the mine have you followed or occupied? A. I have occupied very near everything except boss; gas man and such as that, and know every occupation in the mine. Q. Did you make an examination of the mine down there after Mr. Fautt's death? A. I went in the place where it was supposed to have occurred about 3 days after that, 2 or 3 days. Q. Did you examine the entries, rooms? A. Yes, sir. Q. I will ask you whether or not before that time, there had

been any accumulation of any fine, dry coal dust in the entry? A. There had. Q. Was there any in the room? A. In that particular room? Q. Yes, sir. A. No, sir, not in that particular room. Q. Did you examine the entry where the explosion was? A. Yes, sir. Q. What kind of explosion was that? A. According to my judgment it would be a dust explosion. Q. Did you examine the room there, Henry Miller's room? A. Yes, sir. Q. How many were there, how many shots were there in that room? A. Three. * * * Q. What did you say about these being practical shots? A. They were practical shots. Q. Was this off the 11th north entry? A. Yes, sir. * * *"

Redirect-examination:

"Q. Mr. Fisher, I will ask you if you were ever present down there some short time before the accident that caused the death of John Fautt, when the district mine inspector ordered the pit boss to clean the dust out of that enrty or dampen it or do something? A. I have heard the mine inspector tell him numerous times to clear the dust out of the entry. Q. I will ask you if they had ever cleaned that dust out of the entry? A. Not that I know of, it is there yet."

Recross-examination:

"Q. Who made that statement? A. Tom Scott. Q. To whom did he make it to? A. Henry Pack and Sam McCutcheon. Q. How long was that before this accident? A. We used to go around with him every three months, and I have heard him make that statement before that; I don't remember the length of the time. Q. You are still working down there? A. Yes, sir."

Howard Cribb testified:

"Q. How long did you work in No. 6 mine at Phillips? A. I commenced working in 1906 and I worked there almost continuously since. Q. What different positions have you held there in the mine, Mr. Cribb? A. Quite a number of them, I have mined coal, timbered, drove mules, acted as gas man and fire boss; done might near everything. Q. Did you know John Fautt during his lifetime? A. Yes, sir. Q. Do you remember the occasion of his being killed in the mine? A. Yes, sir. Q. Were you in Phillips at the time? A. Yes, sir. Q. Did you go down in the mine the evening he was killed? A. Yes, sir. Q. Help bring him out? A. Well, to say helped bring him out, I was down there during the time he was being brought out of the mine. Q. Did you make any examination of the mine then? A. Yes, sir. Q. What killed John Fautt? A. Well, the best that I can determine he was suffocated with what is known in mine annals as afterdamp. Q. What kind of explosions was there that time? A. In my judgment, there was a dust explosion. Q. Did you examine the room where it was determined that the explosion started? A. Yes, sir. Q. How many shots did you find in that room? A. Three. Q. Were they practical shots? A. Well, I see—I have seen a great many better shots than they were, and I have seen worse. They were something like an average. Q. The average shot is what you call a practical shot, is it not? A. Well, yes. One of the shots was heavy and the other one was a light shot and the other one was what we call a breaking off shot."

Cross-examination:

"Q. Say these shots you found in this room were practical shots? A. Yes, sir; I couldn't say as to practical shots; I said one was heavy. Q. You have been a miner pretty nearly all of your life? A. Yes, sir. Q. Were they such shots as you would prepare yourself? A. I couldn't say in that instance. Q. Suppose you had not anticipated anything. and had been in the room, would you have left the shots like that? A. There was one that I probably would not have put in myself. Q. Which one was that? A. That breaking of shots. Q. Was the effect, did the shots have about the desired effect? A. They did reasonably well. Q. How about that one in the break through? A. It done reasonably well. * * * Q. Then following shots are not considered among the best miners as being practical? A. No, sir. Q. Were those following shots? A. The best we could determine, it appears that one shot was fired in advance of the other one, but I never thought it would be called a following shot in my consideration. Q. How could you tell? A. Because the shot was far enough advanced that it was not depending on the other shot. Q. How come you to be inspecting these shots? A. I was asked to. Q. Who asked you? A. The mine management. Q. The mine management wanted you to examine them? A. Yes, sir, that was my duty. I was employed as fire boss."

Redirect examination:

"Q. Did the company ever move that dust out of the entry of your knowledge? A. No, sir. Q. Did they ever sprinkle it? A. No, sir."

Cross-examination:

"Q. Has that dust ever been sprinkled in that mine? A. They have done some sprinkling at times to lay dust on partings at times. Q. How long has that been? A. I don't believe it has been under the present management. Q. That has been sometime ago? A. Yes, sir."

Homer Miller, who was working in room No. 11, testified:

"Q. What is your business? A. Coal miner. Q. How long have you followed

coal mining? A. About eight years. * * * Q. Did you know John Fautt during his lifetime? A. Yes. sir. Q. Do you remember the occasion of his death? A. Yes. sir. * * * Q. Were you working in the mine at that time? A. Yes, sir. Q. What were you doing at that time? A. Digging coal. * * *. Q. In your room,—did you work in there that day Mr. Fautt was killed? A. Yes, sir. * * * Q. Now, Mr. Miller, did you put some shots in that room that day? A. Yes, sir. Q. How many? A. Three. Q. Whereabouts were they? A. Two in the room and one starting the cross-cut. Q. Were they practical shots? A. Yes, sir. * * * Q. Did all those shots pull? A. No, sir, there was one standing in the room, and two of them pulled, and cross cut shot and another one was standing. Q. Did you mine it down? A. Yes, sir. Q. It pulled then, if it was mined down? A. Yes, sir. * * * Q. Do you know whether or not there was any coal dust, fine dust accumulated in that entry? A. Yes, sir, plenty of it."

Cross-examination:

"Q. Which was the heavy shot? A. The one that was standing. Q. It didn't push the coal away from the face? A. No, it did not push it away, but it set it out 6 inches from the drill hole and broke it off. Q. Was one of these shots a following-shot? A. No, sir."

George Stephenson, witness for defendant, a miner 45 years, testified:

"Q. In that did you find evidence of a dust explosion? A. The dust around Mr. Fautt, it looked pretty bad for about 100 yards, but after that, it didn't look like it. Q. Did you see any evidence of a dust explosion? A. Well, I don't know as it did. Q. Did you see any burned coal or coke on the ribs? A. No, sir, didn't notice it. Q. What caused that commotion there? A. It was nothing but the heavy shot, and I am satisfied it threw a little fire; of course, I didn't see, but that is my opinion. Q. How long have you worked in No. 6? A. I guess about eight years, seven or eight years. Q. Do you know whether that dust that accumulates there in that room is explosive or not? A. I never tried, but I believe most any dust will fire if there is blaze enough to make it. Q. The dust that accumulates on the bottom of this mine, do you believe that is explosive? A. Well, I believe it is. Q. You never tried it? A. No, sir."

A number of witnesses for the defendant, experienced miners, were of the opinion that the shots fired in room 11 were not practical shots and that the explosion was not a dust explosion, but we cannot weigh the conflicting evidence. We have examined the evidence to determine whether or not there was any evidence before

the jury reasonably tending to sustain the verdict. In our opinion there was such evidence before the jury. But counsel for defendant contends that no witness testified that the "air had become clogged with dust," and for that reason no violation of the law was shown. This action was brought under section 7585, Comp Stat. 1921 (sec. 3982, Rev. Laws 1910), which reads as follows:

"In case any entry or room in any coal mine in this state is so dry that the air becomes clogged with dust, the operator, owner, lessee or agent, or whoever is operating said mine in any capacity, shall have such entry, air-way or room, regularly and thoroughly sprinkled, sprayed and dampened with water, so that the air will not be charged with dust, or if that be impracticable, then the dust shall be removed from the mine and shall not be deposited in any place in the mine where it would be again distributed in the atmosphere by the ventilating currents. * * *"

It is true no witness testified that the "air was clogged with dust" prior to or at the time of the explosion, but the court in his instructions to the jury submitted the law upon that question, and under the instructions the jury must have found such conditions to have existed before they could have returned a verdict for the plaintiff. We think there was sufficient evidence upon which the jury could reasonably have reached that conclusion. It has been held by this court that the evidence is sufficient to sustain a judgment if there is any evidence whatever reasonably tending to prove, either directly and immediately, or by permissible inference. the essential facts. Great Western Coal & Coke Co. v. Serbantas, 50 Okla. 118, 150 Pac. 1042; Missouri, O. & G. Ry. Co. v. Smith, 55 Okla. 12, 155 Pac. 233; Midland Valley Ry. Co. v. Goble, 77 Okla. 206, 186 Pac. 723.

"A judgment, supported by the testimony of a single witness, will be sustained, notwithstanding several other witnesses testify to the contrary on a material point, as this court will not weigh evidence against conflicting evidence." Bruce v. McIntosh, 57 Okla. 774, 159 Pac. 261.

We are of the opinion that this cause should be affirmed.

The judgment of the trial court was rendered on the 10th of September, 1919, in the sum of $2,500, and a supersedeas bond executed by the plaintiff in error, Folsom Morris Coal Mining Company, and the National Surety Company as surety, was filed and approved, which said bond is attached and made a part of the case-made.

The defendant in error in her brief has asked the court that in case such judgment should be affirmed judgment be entered against the surety on the appeal bond. Judgment is therefore entered in this court against the National Surety Company as surety on said bond in the sum of $2,500, with interest thereon at the rate of six per cent. per annum from the 10th day of September, 1919, and for costs: for which execution may issue.

By the Court: It is so ordered.